# IN THE COURT OF APPEALS OF IOWA

No. 23-0097
Filed March 29, 2023

**IN THE INTEREST OF N.G.,**
**Minor Child,**

**H.G., Mother,**
    Appellant.
_____

Appeal from the Iowa District Court for Jasper County, Steven J. Holwerda, District Associate Judge.

A mother appeals the termination of her parental rights. **AFFIRMED.**

Nicholas A. Bailey of Bailey Law Firm, P.L.L.C., Altoona, for appellant mother.

Brenna Bird, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Dusty Clements of Clements Law & Mediation, Newton, attorney and guardian ad litem for minor child.

Considered by Bower, C.J., and Badding and Buller, JJ.

**BULLER, Judge.**

The mother appeals the termination of her parental rights, arguing the State did not meet its burden to prove the statutory elements, termination is not in the child's best interests, and a permissive exception should preclude termination. We affirm.

## I.    Background Facts and Proceedings

When the child was born in spring 2020, both the mother and child tested positive for marijuana. The Iowa Department of Health and Human Services (HHS) declined to remove the child then because the mother agreed to engage with voluntary services. Within months, the mother was without stable housing and asked HHS to place the child with relatives. HHS did as the mother asked, and the State filed a child in need of assistance (CINA) petition based on the mother's drug use, lack of housing, lack of contact with the child, and failure to engage with mental-health services and counseling.

The child was returned to the mother's care for a time, but in February 2021 HHS learned that the mother was still using illegal drugs and left the child with non-relative adults for weeks at a time. The next month, the mother and child both tested positive for marijuana, and the child was again removed and placed with relatives. The drug-screen was prompted by an HHS home visit where workers found the child "passed out on the floor face down and lethargic."

The mother pled guilty to child endangerment resulting in serious injury, a class "C" felony, for which she remained on formal probation at the time of termination. In the factual basis for the plea, the mother admitted that she "knowingly or recklessly exposed [her] child to a hazard or danger to the child's

health or safety" and that she "allowed [her] child to be in the care of people using marijuana, which exposed [her] child to [THC] being inhaled."

The child has not been returned to the mother's care since early 2021, and there have been no trial periods at home. At the time of the termination trial, the mother was only allowed supervised visits, but she had unsupervised visits at earlier points in the case. The mother made her most significant progress in early summer 2022, when HHS was making tentative plans to return the child to the mother's care. However, shortly before the scheduled hearing, the mother contacted HHS and asked to postpone the hearing until she found new living arrangements, as she was the victim of domestic violence. Within hours, the mother again contacted HHS, now claiming "everything's fine" and the child "can come home tomorrow." The HHS worker explained to the mother that she "can't return [the child] to a situation where there could be domestic violence." The mother admitted at the termination trial that she lied when she told HHS everything was fine, and she lied again at the courthouse when she denied the domestic abuse.

To quote the juvenile court, "things deteriorated from there." HHS began requiring supervised visits because the child would act inappropriately and call the family member he was placed with gender-based slurs, which he presumably learned from the mother. Around the same time, the mother demonstrated poor judgment by having her new paramour (who the family members did not know and failed to pass a background check) pick up the child.

The mother was granted another six months to work toward reunification in February 2022. Conditions of reunification included her obtaining stable housing

and employment; not using illegal drugs and providing a substance-free environment for the child; completing mental-health counseling and medication; and cooperating with HHS services, including attending all available visitation. The mother did not meet these conditions.

During the life of the case, the mother has lived in at least twelve places, had at least seven jobs, and been involved with at least four paramours. In the three weeks preceding the termination trial, the mother was staying with her mother. She seemingly had no other housing plans.

The mother had a spotty employment record and was unemployed at the time of the termination trial. She did not provide any financial support toward the child while placed out of her care. The mother explained at trial that her reason for not financially contributing to the child's care was that the foster parents "get paid for taking care of [the child] by the government."

The mother has been offered extensive services, including substance-abuse and mental-health evaluation and treatment, safety planning, crisis intervention services, family team meetings, gas cards, and visitation. The mother took advantage of some of these services and made some intermittent progress toward sobriety. She has been "very open" with HHS about having issues with depression, post-traumatic stress disorder, and anxiety. She more reluctantly admitted to problems with manic depression, split personality, and borderline personality disorder. She also has a history of hospitalization for self-harm and suicidal ideation. As of termination, the mother was only attending half of her scheduled appointments.

The mother exercised most of her visits, but she made a number of choices that reflect disinterest in the child. For example, as the juvenile court found, "when given the opportunity to live in the same city as the child and to make visits and contact and bonding more convenient and more accessible, the mother chose to live elsewhere until three weeks [before trial]." In other words, "For almost two years, [the mother] chose to live in a variety of places, with a variety of people, in settings admittedly inappropriate for the child."

The child, who has been placed outside the mother's care for nearly two years or two-thirds of the child's life, is doing well. The current placement is willing to adopt the child.

At trial, the father failed to appear, and the mother resisted termination of parental rights. The State, the child's guardian ad litem, and HHS recommended termination. The HHS worker also opined that the child could not be returned to the mother's care at the present time or within six months, and that a guardianship was not appropriate because the child "needs permanency" and the mother has been combative or "volatile" toward the existing placement.

The juvenile court terminated the parental rights of both parents. Only the mother appeals.

## II.     Standard of Review

"We review termination proceedings de novo." *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000). "The primary interest in termination proceedings is the best interests of the child." *Id.*

### III.     Discussion

On our de novo review, we find the evidence supports termination on at least two different statutory grounds, we find termination is in the best interests of the child, and we reject any permissive exception that could preclude termination.

### A.  Statutory Elements

The juvenile court found terminating the mother's rights was warranted under Iowa Code section 232.116(1)(d), (e), and (h) (2022).  We elect to affirm based on paragraphs (d) and (h).

First, section 232.116(1)(d) allows the juvenile court to terminate parental rights after finding two elements:

> (1) The court has previously adjudicated the child to be a child in need of assistance after finding the child to have been physically or sexually abused or neglected as the result of the acts or omissions of one or both parents, or the court has previously adjudicated a child who is a member of the same family to be a child in need of assistance after such a finding. This paragraph shall not be construed to require that a finding of sexual abuse or neglect requires a finding of a nonaccidental physical injury.
> (2) Subsequent to the child in need of assistance adjudication, the parents were offered or received services to correct the circumstance which led to the adjudication, and the circumstance continues to exist despite the offer or receipt of services.

The CINA adjudication in this case stemmed from issues related to parental drug use, the mother's mental-health issues, and the lack of consistent housing and overall stability.  On each of these grounds, the mother has made one step forward and two steps backwards.  She pled guilty to a class "C" felony for exposing the child to illegal drugs.  She attended only half of her mental-health appointments.  And she has had at least seven jobs, four paramours, and twelve housing situations during the life of the case.  She was also offered extensive services over

the course of more than two years, and the concerns that led to the original CINA adjudication persisted. The State met its burden on section 232.116(1)(d).

Second, section 232.116(1)(h) has four elements:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

There is no serious dispute over the first three elements—that the child at issue is three years of age or younger, was adjudicated as a CINA, and was removed from the home for more than six consecutive months without a trial period at home. The only possible dispute is over the fourth element, whether the child could be returned to her custody at the time of the termination trial. *See In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (interpreting "at the present time" to mean "at the time of the termination hearing"). We agree with the juvenile court that the child could not be returned. The mother's only serious progress toward reunification came in the three weeks before termination, and we agree with the juvenile court this is "too little, too late." Throughout the life of the case, the mother failed to obtain safe and stable housing or consistent employment. She made only intermittent progress regarding mental health and maintains unhealthy relationships. And her visits with the child were fully supervised at the time of termination. On this record, we agree the child could not be returned the mother's custody.

On appeal, the mother does not clearly set forth which elements of either of these statutory bases she challenges. The gist of her argument is that she made enough progress toward reunification to negate the statutory grounds. We disagree and reject the rose-colored characterization of progress made in the mother's petition on appeal, largely based on the evidence set forth elsewhere in this opinion. We also note that, even at the termination trial, the mother had problems with honesty. She simultaneously denied that she "ever" smoked marijuana near her child but admitted that she smoked marijuana while pregnant. She minimized the conduct leading to her guilty plea, essentially saying she pled guilty just to avoid prison. And she lied about domestic violence, directly impacting the safety of the home. This dishonesty or failure to accept responsibility weighs against reunification and supports the statutory grounds for termination.

### B. Best Interests of the Child

"It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *In re A.B.*, 815 N.W.2d 764, 777 (Iowa 2012) (citation omitted); *accord* Iowa Code § 232.116(2) (requiring the juvenile court to "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child.").

We agree with and adopt the juvenile court's findings on best interests, as they correctly summarize the evidence and also reflect our own assessment of the record evidence:

The mother's ability to care for the child is obviously affected by her lack of stability and consistency, her lack of stable housing and a stable job, and her lack of follow through with mental health counseling. It is also affected by her poor decision-making with housing situations, job opportunities, and relationships; as well as her nomadic lifestyle, coupled with her refusal to accept her mother's offer to live closer to her child in a safer and more supportive environment. The mother has not been able to care for the child for over the past 20 months and will not be able to do so in the near future. Her problems, as recited above, have prevented her from providing for the child's safety, long-term nurturing and growth, and physical, mental and emotional needs, and will continue to prevent her from doing so for the foreseeable future.

In contrast, the child's current relative placement, [the extended family members], have shown themselves capable of providing these things since March 2021 or two-thirds of the child's life, and the child is doing well. It is in the best interest of the child to live in the care of [the extended family members] rather than remain in limbo until his parents can correct their problems, if ever.

In short, this is "one of those unfortunate cases in which a parent progresses and regresses, the progress is not enough to have the children returned to their care, and matters simply reach a point at which the child's best interests command permanency and stability." *In re I.S.*, No. 20-0976, 2020 WL 6481088, at *4 (Iowa Ct. App. Nov. 4, 2020).

In part, the mother's petition on appeal seems to assert that a guardianship would be preferable to termination. Our case law holds otherwise. *In re A.S.*, 906 N.W.2d 467, 477 (Iowa 2018) ("Importantly, 'a guardianship is not a legally preferable alternative to termination.'" (quoting *In re B.T.*, 894 N.W.2d 29, 32 (Iowa Ct. App. 2017)). To the extent we need address this argument further, we find that the mother's antagonism toward the family members where the child was placed, and the slurs repeated by the child concerning them, defeat the mother's argument about a guardianship.

### C. Permissive Exceptions[1]

In her petition, the mother relies on two permissive exceptions to termination: her bond with the child and the child's placement with a relative. *See* Iowa Code § 232.116(3)(a), (c). For both permissive exceptions, the mother bears the burden of proof by clear and convincing evidence. *A.S.*, 906 N.W.2d at 475–76.

First, as to the relative placement, this exception only applies when "[a] relative has legal custody of the child." Iowa Code § 232.116(3)(a). At the time of termination, HHS had legal custody of the child—not the foster placement with family members. This exception therefore does not apply. *See In re A.B.*, 956 N.W.2d 162, 170 (Iowa 2021).

Second, the mother argues that her bond with the child should preclude termination. *See* Iowa Code § 232.116(3)(c). The juvenile court found the mother failed to carry her burden to prove this exception, and so do we. We do not doubt the mother loves her child. But a parent's love is not enough to prevent termination, nor is the mere existence of a bond. *See A.B.*, 956 N.W.2d at 169–70; *D.W.*, 791 N.W.2d at 709. Whatever bond may exist between mother and child here, it does not outweigh the need to provide this child a permanent, safe, and stable home. The mother's history convinces us she cannot provide such a home now or any time in the immediate future. We, like the juvenile court, decline to apply this permissive exception.

---

[1] The permissive-exception argument is intermingled with the best-interests analysis of the mother's petition. We address these issues separately.

**IV.     Conclusion**

Having rejected all of the mother's challenges on appeal, we affirm the termination of parental rights.

**AFFIRMED.**